United States Court of Appeals,

Eleventh Circuit.

No. 95-8793.

Donna MIZE, Plaintiff-Appellant,

v.

The JEFFERSON CITY BOARD OF EDUCATION;  Donald O. Rooks, Dr.,
individually and in his official capacity as Superintendent;  Lois
DeWeese, individually and in her official capacity as former
Principal of Jefferson City Elementary School, Defendants-
Appellees.

Aug. 29, 1996.

Appeal from the United States District Court for the Northern
District of Georgia. (No. 2:94-CV-32-WCO), William C. O'Kelley,
Judge.

Before KRAVITCH and CARNES, Circuit Judges, and HILL, Senior
Circuit Judge.

KRAVITCH, Circuit Judge:

In this § 1983 action against the Jefferson City Board of
Education and Jefferson City school officials, Donna Mize alleges
that she was fired in retaliation for comments she made concerning
the disciplinary treatment of one of her students, in violation of
her rights under the First Amendment and § 504 of the
Rehabilitation Act of 1973.  We agree with the district court that
Mize has failed to present evidence sufficient to demonstrate that
her discharge was based on her statements.  Accordingly, we affirm
the grant of summary judgment in favor of defendants.

I.

Mize was employed as an untenured special education teacher in
the Jefferson City, Georgia school system during the 1991-92 school
year.  This was her third year of employment in a program that
provided teachers for children with mental disabilities in three

school districts.  The program was supervised by Dr. Susan Galis, special education director for the Jefferson City School System and the Commerce City School System, and Melanie Brittain, special education director for the Jackson County School District.[1]  The two individual defendants in this case are Dr. Lois DeWeese, principal of Jefferson City Elementary School, and Dr. Donald Rooks, superintendent of the Jefferson City Board of Education.

As an untenured employee, Mize was employed for a renewable one-year term.  According to appellees, Mize's contract was not renewed because her performance was inadequate.  This claim is supported by considerable evidence.  At the beginning of the school year, Brittain had received complaints from one of Mize's paraprofessional teaching aides about the lack of structure in Mize's classroom and Mize's propensity to take long breaks and lunches.  After a meeting between Mize and Brittain prompted by these complaints, Brittain, DeWeese, and Galis directed a memo to Mize in September 1991 setting forth guidelines for managing her class.  According to Galis, she had never before had to write a memo to a teacher in order to get that teacher to impose the necessary structure and organization reflected in the memo.  Furthermore, defendants claim that Mize failed to follow the directives of this memo and that her teaching continued to be inadequate.  Galis also testified that based on many visits to Mize's classroom she felt that Mize was not adequately attending to the needs of her students.  This testimony was corroborated by

---

[1]Jefferson City, Commerce City and Jackson City school systems were involved in a "shared services" program.

Brittain who stated that, in light of the problems in Mize's classroom, she had agreed to provide a parent with "home-based" services after that parent expressed complaints about the lack of structure in Mize's classroom.

In October 1991, Galis—after a meeting that included Mize, DeWeese, Brittain and herself—requested that an outside consultant, Lynda Hale, observe Mize's classroom and provide constructive advice. Hale concluded that Mize was focusing on teaching skills that were inappropriate for students with the level of disability of those in the class and that Mize was a "poor" teacher.

Hale's conclusions were presented to Dr. Galis prior to March 6. On March 6, after already discussing Mize with Brittain, Galis met with Rooks to discuss the renewal of contracts of special education teachers in the shared instruction program. Galis and Rooks both testified at their depositions that Galis verbally recommended to Rooks that Mize's contract not be renewed. Rooks testified that he concurred with Galis's recommendation and made the decision at that time not to rehire Mize. On April 3, 1992, in a meeting with DeWeese, Rooks told the principal that he was not going to renew Mize's contract. Later that same day, DeWeese told Mize that she would not be rehired.

Mize relates a different story of Rooks's decision not to renew her contract. She claims that Rooks's decision not to rehire her did not occur until April 3 and that it was based on the recommendation of DeWeese, which was made in retaliation for statements made by Mize. The statements concerned the following incident: On February 27, 1992, Mize returned from lunch to find

that a paraprofessional had placed a severely mentally disabled five-year-old boy in a "time-out room" (i.e., a closet) as punishment for urinating on himself. Mize learned that DeWeese had told the paraprofessional that it was acceptable to place the student in that room if it appeared that he had urinated intentionally. Mize approached DeWeese the following day about the incident, and DeWeese admitted that she had approved of this disciplinary method. A few days later, Mize sent a letter to Rooks complaining about the use of "time-out rooms," and she met with him on March 6, the same day that Rooks had received Galis's recommendation not to renew Mize's contract. Although occurring on the same day, Rooks's meeting with Mize occurred after his meeting with Galis. At the meeting with Mize, Rooks appeared troubled by DeWeese's approach. Afterwards, he investigated the allegations and sent a memo to DeWeese prohibiting the use of "time-out rooms."

Despite Rooks's agreement with Mize that the use of "time-out rooms" was inappropriate, Mize alleges that she was fired in retaliation for her comments concerning the incident in which a student was confined after urinating on himself. She argues that Galis played no role in the decision not to renew her contract and that the argument that she was not rehired because of her poor performance is pretextual. Rather, Mize alleges that Rooks made his decision at the April 3 meeting with DeWeese to discuss the school's personnel. She contends that DeWeese demanded that Mize's contract not be renewed and that Rooks acceded to this demand. In sum, Mize argues that the defendants' contention that Rooks's decision was based on Galis's recommendation is a post-hoc

justification for what was, in fact, a retaliatory act by DeWeese.

II.

In deciding a claim of First Amendment retaliatory discharge, a court looks to "(1) whether the employee's speech involves a matter of public concern, (2) whether the employee's interest in speaking outweighs the government's legitimate interest in efficient public service, (3) whether the speech played a substantial part in the government's challenged employment decision, and (4) whether the government would have made the same employment decision in the absence of the protected conduct." *Beckwith v. City of Daytona Beach Shores,* 58 F.3d 1554, 1563-64 (11th Cir.1995) (citing *Bryson v. City of Waycross,* 888 F.2d 1562, 1565-66 (11th Cir.1989)).

The third element of the "Bryson" test asks whether there is a "substantial" casual link between the employee's speech and the adverse employment decision. Where causation is lacking, an employee's claim of retaliatory discharge must fail and it is unnecessary to consider the other three elements. *Beckwith,* 58 F.3d at 1564. Likewise, a claim under § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, for retaliatory discharge, will also fail if the evidence is insufficient as a matter of law to prove a causal nexus between retaliatory motive and the adverse employment decision. *C.f. Morgan v. City of Jasper,* 959 F.2d 1542, 1547 (11th Cir.1992) (A necessary element in establishing a prima facie case of retaliatory discharge under Title VII is a "causal connection between the protected activity and the adverse employment action." (citation omitted)). It is to the issue of causation that we now

turn.

The district court, viewing the evidence in the light most favorable to the appellant, held that there was no genuine issue of material fact on the issue of causality. That is, as a matter of law, the proffered evidence was insufficient for a jury to find that the decision not to renew Mize's contract was motivated by a desire to retaliate in response to her expression. We review the district court's summary judgment order *de novo,* applying the same legal standard employed by the district court in the first instance. *Hairston v. Gainesville Sun Publishing Co.,* 9 F.3d 913, 918 (11th Cir.1993).

The district court must enter an order of summary judgment when, taking the facts in the light most favorable to the nonmoving party, there is "no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). Where the nonmoving party has failed to make a sufficient showing "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," there exist no genuine issues of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). "Genuine disputes are those in which the evidence is such that a reasonable jury could return a verdict for the non-movant. For factual issues to be considered genuine, they must have a real basis in the record." *Hairston,* 9 F.3d at 919 (citations omitted).

Where the non-movant presents direct evidence that, if believed by the jury, would be sufficient to win at trial, summary judgment is not appropriate even where the movant presents

conflicting evidence. It is not the court's role to weigh conflicting evidence or to make credibility determinations; the non-movant's evidence is to be accepted for purposes of summary judgment. *See, e.g., Beckwith,* 58 F.3d at 1564; *Hairston v. Gainesville Sun Publishing Co.,* 9 F.3d at 918; *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630-32 (9th Cir.1987).

Likewise, all inferences drawn from the evidence must be viewed in the light most favorable to the nonmoving party. *Isenbergh v. Knight-Ridder Newspaper Sales, Inc.,* 84 F.3d 1380, 1383 (11th Cir.1996). Nevertheless, there is a difference between direct evidence and inferences that may permissibly be drawn from that evidence. Where a non-movant presents direct evidence that creates a genuine issue of material fact, the only issue is one of credibility; thus, there is no legal issue for the court to decide. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 253-55, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986) (credibility determinations are a jury function). A court need not permit a case to go to a jury, however, when the inferences that are drawn from the evidence, and upon which the non-movant relies, are "implausible." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 592-94, 106 S.Ct. 1348, 1359, 89 L.Ed.2d 538 (1986) (noting that in the context of anti-trust actions, the Court has "emphasized that courts should not permit factfinders to infer conspiracies [to engage in anti-competitive activity] when such inferences are implausible ..." (quoting *Monsanto Co. v. Spray-Rite Service Corp.,* 465 U.S. 752, 762-64, 104 S.Ct. 1464, 1470, 79 L.Ed.2d 775

(1984))); *see also Anderson,* 477 U.S. at 253-55, 106 S.Ct. at 2513 (all *justifiable* inferences are to be drawn in non-movant's favor). Where the evidence is circumstantial, a court may grant summary judgment when it concludes that no reasonable jury may infer from the assumed facts the conclusion upon which the non-movant's claim rests. The Ninth Circuit has stated the point clearly:

> Inferences must ... be drawn in the light most favorable to the nonmoving party.... Inferences may be drawn from underlying facts that are not in dispute, such as background or contextual facts ... and from underlying facts on which there is conflicting direct evidence but which the judge must assume may be resolved at trial in favor of the nonmoving party. Assuming the existence of these underlying facts, however, an inference as to another material fact may be drawn in favor of the nonmoving party only if it is "rational" or "reasonable" and otherwise permissible under the governing substantive law.
>
> .   .   .   .   .
>
> If the nonmoving party produces direct evidence of a material fact, the court may not assess the credibility of this evidence nor weigh against it any conflicting evidence presented by the moving party. The nonmoving party's evidence must be taken as true. Inferences from the nonmoving party's "specific facts" as to other material facts, however, may be drawn only if they are reasonable in view of other undisputed background or contextual facts and only if such inferences are otherwise permissible under the governing substantive law. This inquiry ensures that a "genuine" issue of material fact exists for the factfinder to resolve at trial.

*T.W. Elec. Serv. Inc.,* 809 F.2d at 631 (citations omitted).

In its motion for summary judgment, appellees had the initial burden of demonstrating to the district court that based on the pleadings, depositions, answers to interrogatories, and admissions, there existed no genuine issues of material fact. *Hairston,* 9 F.3d at 918. Appellees have met this initial burden through the testimony of Rooks and Galis that it was their decision not to renew Mize's contract, Rooks's statement that he made the final

decision not to rehire Mize prior to his meeting with DeWeese, memoranda indicating that Mize was ineffective in running her classroom, and Hale's testimony that Mize was not a competent teacher. This evidence is sufficient to shift the burden to Mize to demonstrate that there remain genuine issues of material fact.

Specifically, Mize must present evidence sufficient for a reasonable jury to infer that Rooks and Galis were lying and that the decision not to renew Mize's contract was the result of Rooks acceding to DeWeese's alleged desire to retaliate. In support of this argument, Mize relies on the following: (1) several months before Galis's alleged conversation with Rooks, Galis told a parent that Mize would be returning the next year, (2) according to Mize, Galis expressed surprise upon hearing that Mize would not be rehired, (3) DeWeese's statement to Mize that the decision not to renew her contract was not based on her performance, (4) Rooks's statement to Mize that there had been no complaints to him about her performance, (5) the temporal proximity of her disagreement with DeWeese and the decision not to renew her contract, and (6) at the April 3 meeting to review personnel, DeWeese allegedly recommended that Mize not be rehired.

Based on these alleged facts, Mize contends that there is a genuine issue of material fact as to whether she was fired in retaliation for her statements regarding the use of "time-out rooms." Although she presents no direct evidence, Mize argues that from the circumstantial evidence presented, a jury could conclude that Galis and Rooks concocted their story and that what in fact happened was that Rooks decided not to renew Mize's contract

because of Mize's opposition to DeWeese's method of disciplining a student.

Although Mize presented evidence of the type that in some situations could create a genuine issue of material fact, in the context of this case, the evidence she adduces is insufficient, as a matter of law, for a finding of liability. *See Beckwith,* 58 F.3d at 1564 ("It is neither possible nor desirable to fashion a single standard for determining when an employee has met her initial burden of demonstrating that a retaliatory intent was a "substantial' or "motivating factor' behind a government employment decision." (citations omitted)). No reasonable jury could conclude that Rooks based his decision not to renew Mize's contract on anything other than his belief that she was not qualified to continue in her position as a special education teacher.

We consider first Galis's comments. Given the context and factual background of this case, no reasonable jury could conclude that Galis was fabricating her story based merely on the fact that two months prior to her conversation with Rooks she told a parent that Mize would return next year. Neither could such an inference be drawn from the assumed fact that Galis had told Mize, after the latter had learned her contract would not be renewed, that she was unaware that she had not been rehired for the next year. To make the inference suggested by Mize requires stripping Galis's statements from the context in which they were made: the comment to the parent was made several months before any decision had been reached about Mize's contract and both conversations occurred in the presence of Mize. Galis's statements suggest nothing more than

a desire to avoid an awkward situation. Although other inferences are not impossible, "[t]he mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.,* 477 U.S. at 252, 106 S.Ct. at 2512; *see also T.W. Elec. Serv. Inc.,* 809 F.2d at 631 (court must consider non-movant's "specific facts" along with undisputed background or contextual facts).

Next, the evidence proffered concerning statements made by DeWeese and Rooks does not create a reasonable inference that Rooks made his decision in response to pressure from DeWeese. These statements also must be taken out of context to yield the inference suggested by Mize. Mize describes her conversation with DeWeese as follows:

> I questioned her as to why [my contract was not being renewed], could she tell me why and she said no, that she did not have to tell me why. I said—she told me it had nothing to do with my teaching performance, that she had not received complaints, but that she didn't have to give me a reason why.

Deposition of Donna Mize at 216.

Rooks's statement occurred when Mize met with him to him to discuss the decision not to renew her contract. Mize recounts the conversation as follows:

> Q: What do you recall being said in your conversation with Dr. Rooks?
>
> A [by Mize]: I told him I was there to see—that I had just been told that I was not—that Dr. DeWeese was not recommending me for reemployment and asked him if he'd give me a reason and he told me no, he did not have to give me a reason.
>
> I made the comment, "But don't you think it's only fair that if you're going to fire me then tell me why?" He said that it was not personal against me. He stated that he did not know me well enough to make judgments against me

personally cause he had only met me the one time he stuck his head in the door. That he had not received complaints from anyone about me, that they just wanted to take a different approach.

Q: Did he describe what that approach was?

A: No. And I said, I made a comment something cause I asked him something about complaints. I said something about, "Dr. Rooks, I've never received complaints from you or Susan Galis or Dr. DeWeese or even any parent." And he said, "Oh, no, I've never received complaints about you either." He said, "I've never received a complaint about you." ... I said, "You're not going to give me an answer?" He said no and I left.

*Id.* at 219-20.

As with Galis's statements, although we must accept that these conversations occurred, we need not accept the claim that they create a reasonable inference that Rooks acted with retaliatory intent (or implemented DeWeese's desire to retaliate) when he decided not to renew Mize's contract. In this case, it is undisputed that Rooks had no motive to retaliate against Mize. It was DeWeese's actions about which Mize complained, not Rooks's. In fact, Rooks agreed with Mize and followed up on her concerns by issuing a memorandum prohibiting the use of "time-out rooms." In order to link a retaliatory motive to Rooks, Mize argues that he was a weak-willed supervisor who acceded to DeWeese's demand that he retaliate on her behalf. For Mize to prevail, a juror must be able reasonably to infer from the statements discussed above that DeWeese forced Rooks to retaliate against Mize because DeWeese resented the fact that Mize complained to Rooks himself about activity that Rooks agreed was inappropriate. Although this is not an impossible scenario, it is not one that is supported by the facts presented to the district court. *See Anderson v. Liberty*

*Lobby, Inc.,* 477 U.S. at 249-50, 106 S.Ct. at 2511 ("If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." (citations omitted)).

The hemming and hawing by DeWeese and Rooks when confronted by Mize may have denied her a clear answer as to why she was fired, but the statements do not demonstrate that she was denied her constitutional and statutory rights. There is simply not enough evidence to move from the statements made by defendants to the conclusion that Rooks implemented DeWeese's will.

We next consider whether the temporal proximity of Mize's complaint about "time-out rooms" to the time she was informed of the decision not to renew her contract creates an inference of retaliation. Where termination closely follows protected activity, it is usually reasonable to infer that the activity was the cause of the adverse employment decision. *See, e.g., Bechtel Constr. Co. v. Secretary of Labor,* 50 F.3d 926, 934 (11th Cir.1995) (inference permissible where employee questioned safety procedures in radiation control area of plant). It does not follow, however, that every time a person engages in constitutionally protected activity within a short time prior to an adverse employment decision that an inference may reasonably be drawn that they were related. Every act of expression is not equally as likely to draw a negative response from an employer as every other; for the link to be made, it must be reasonable to assume that the employer had cause to retaliate. There is no reasonable evidence that Rooks had any reason to retaliate against Mize; in fact, he took her complaint seriously, going so far as to prohibit the use of

"time-out rooms."  Taking the evidence in the context of the entire case, the fact that the adverse employment decision took place shortly after Mize's complaint does not, by itself, permit a reasonable inference that Rooks's decision was motivated by a desire to retaliate.

Finally, because there is no reasonable basis for rejecting Rooks's testimony that he made the decision on March 6 not to renew Mize's contract, it is irrelevant that DeWeese subsequently recommended that Mize's contract not be renewed.

Considering the evidence relied upon by Mize in the context of all the facts presented on summary judgment, interpreted in the light most favorable to Mize, we conclude that she failed to present evidence from which a reasonable jury could find that she was fired in retaliation for her statements.[2]  Accordingly, summary judgment in favor of defendants was appropriate.

AFFIRMED.

---

[2]Because we hold that Mize has failed to present evidence sufficient for a reasonable jury to find that the decision not to renew her contract was based on her statements, we need not reach the other three elements of the "Bryson" test.  Specifically, we do not reach the issue, decided by the district court, of whether Mize's statements addressed an issue of "public concern."

Also, we note that in holding that there is insufficient evidence, we are not questioning "the settled rule that the inherent difficulty of proving discriminatory intent often requires reliance on circumstantial evidence." *Beckwith,* 58 F.3d at 1566.  We hold only that the evidence in this case permits no inference that would create a genuine issue of material fact.